# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | |
|---|---|
| TRAVIS J. MORRIS,     ) | |
|     ) | |
|     **Plaintiff,**     ) | |
|     ) | |
|     v.     ) | **CAUSE NO. 1:14-cv-00243-SLC** |
|     ) | |
| **COMMISSIONER OF SOCIAL**     ) | |
| **SECURITY,** *sued as Carolyn W. Colvin,*     ) | |
| *Acting Commissioner of Social Security,*     ) | |
|     ) | |
|     **Defendant.**     ) | |

## OPINION AND ORDER

Plaintiff Travis J. Morris appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (*See* DE 1). For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Morris applied for DIB and SSI in November 2012, alleging disability as of April 17, 2012. (DE 9 Administrative Record ("AR") 58, 66). The Commissioner denied his applications initially and upon reconsideration. (AR 96, 100, 107, 114). Morris requested a hearing before an Administrative Law Judge (AR 121), and Administrative Law Judge Jennifer Fisher ("the ALJ") held a hearing on January 8, 2014, at which Morris was represented telephonically by counsel (AR 31, 33). On February 21, 2014, the ALJ issued an unfavorable decision, finding that Morris

---

[1] All parties have consented to the Magistrate Judge. (DE 16); *see* 28 U.S.C. § 636(c).

was not disabled because he was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (AR 25). Morris requested the Appeals Council review the ALJ's decision (AR 9), and the Appeals Council denied Morris's request, making the ALJ's decision the final, appealable decision of the Commissioner (AR 5).

Morris filed a complaint with this Court on August 10, 2014, seeking relief from the Commissioner's final decision. (DE 1). In this appeal, Morris alleges that the ALJ erred by: (1) finding that Morris's narcolepsy did not equal Listing 11.03; (2) rejecting the opinion of Morris's treating physician; (3) equating deficiencies in Morris's concentration, persistence, and pace to the ability to perform simple work at a flexible pace; and (4) finding Morris's allegations credible only as to his inability to perform past work. (DE 27 at 1).

## II. FACTUAL BACKGROUND[2]

### A. Background

At the time of the ALJ's decision, Morris was 35 years old. (AR 36). Morris has a high school education, which included taking special education classes. (AR 207). His employment history includes jobs as a welder in a steel factory from 1998 to 2001 and as a city bus driver from 2001 to April 17, 2012. (AR 202, 208). Morris attempted to return to his work as a bus driver from October 20, 2012, through November 14, 2012, but he had to leave work again due to his condition. (AR 202).

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 401-page administrative record necessary to the decision.

*B. Morris's Testimony at the Hearing*

At the hearing, Morris testified that he lived with his twin 12-year-old boys, who stayed with him most of the time. (AR 42). Morris used to work as a bus driver and he had a commercial driver's license ("CDL"). (AR 36). He stated that he lost his CDL because he could not pass the requirements for the test. (AR 36). He received a letter that stated he was ineligible for a CDL because he has narcolepsy and is sleep dependent on a Continuous Positive Airway Pressure ("CPAP") machine due to his sleep apnea. (AR 37). Morris also has back pain, caused by a tumor in his back and by a bad accident he had in 2000 or 2001. (AR 37). Morris also struggles with high blood pressure at times. (AR 37).

Morris testified that he was not taking medication for his high blood pressure, narcolepsy, or his other conditions because he did not have any insurance and could not afford it. (AR 38, 40). Morris testified that his former employer cut off his insurance after he had been unable to work. (AR 38). Morris applied for insurance through Medicaid, but he was denied because he had to wait until it had been a year since he last had insurance through his employer. (AR 38).

Morris stated that his doctor told him he could not work anymore when he had a second sleep study after his medication had not been working. (AR 39). He stopped work completely after November 2012. (AR 39). When Morris did have insurance, he took medication, including Nuvigil for six months. (AR 40). The Nuvigil worked for about a week or so before it stopped working, so his dosage was increased. (AR 40, 49). The increased dosage of Nuvigil worked again, but then it stopped working too. (AR 40, 49). Then Morris's doctors switched his medication, but the new medication did not work at all. (AR 40). When Morris lost his

insurance, the medication would have been $450 per month, and Morris could not afford the medication.  (AR 40).  At the time of the hearing, Morris had not been taking medication or seeing his doctor for about four months due to his loss of insurance.  (AR 40).  Morris did call free and low-cost clinics to ask about getting parts for his CPAP machine, but he was told they did not have programs for that.  (AR 41).  Morris explained that he had borrowed an old CPAP machine when his stopped working, and he is using "the old, grimiest parts to sleep with every night [so that he does not] die at night."  (AR 41).  He had used the same mask for a year.  (AR 41).

Morris explained that his sleeping problems make it hard to get up in the morning and hard to plan anything during the day, because he does not know "when it's going to hit [him], or when [he's] going to be tired."  (AR 41).  He has a hard time focusing because he is always sleepy, to the point that he cannot watch television or cook.  (AR 42).  It takes him two or three days to watch a movie because he falls asleep while trying to watch it.  (AR 52).  Morris explained that he does still drive, but he stated that he only drives in the area around his home, where his parents and brother also live.  (AR 42-43).  Morris stated that he does not drive on the highway.  (AR 42).  Morris did drive to the hearing, but his brother was with him in the car.  (AR 43).

When Morris was working as a bus driver, he had difficulty staying awake, and he fell asleep once and had an accident.  (AR 43).  He tried taking medication, but it only helped temporarily, and although he tried to drink five or six cups of coffee to fight off the sleepiness, it did not work.  (AR 49-50).  Morris stated that his sleeping problems got worse over time, and

that it got to the point that it was too dangerous for him to drive.  (AR 50).  He would no longer

trust himself to drive a bus with 60 people on board, because he would be putting his passengers'

lives in jeopardy.  (AR 50).  Morris believed that he would have trouble doing jobs other than

driving a bus, because he really cannot stay awake while he is doing anything, even just cooking

a meal.  (AR 51).

He reported that he sleeps with the CPAP machine to keep his airways open, but he still

does not sleep well.  (AR 44).  He sleeps between four and eight hours per night, and he also falls

asleep three or four times during the day everyday, for periods between one and three hours at a

time.  (AR 45-46).  Morris estimated that he sleeps between 10 and 14 hours total over the course

of a full day.  (AR 46).  His sleeping problems make him groggy, so he has a hard time focusing

on getting even simple tasks completed, which then causes him to feel frustrated and depressed.

(AR 46-47).  Morris has to write down everything he needs to do on a list, because otherwise he

will not be able to concentrate long enough to get things done.  (AR 47).

Morris does not help his sons with their homework, because it is too difficult for him.

(AR 48).  He feels like his children "really suffer a lot because . . . they don't have a daddy like

they used to."  (AR 48).

### C. Vocational Expert's Testimony at the Hearing

A vocational expert, Marie Nicole Kieffer ("the VE"), also testified at the hearing.  (AR

53-56).  The VE, after reviewing the records in the file related to Morris's work history,

answered a hypothetical question posed by the ALJ, assuming a hypothetical individual with

Morris's age, education, and work experience.  (AR 53-56).  The ALJ's hypothetical asked the

VE to

> [P]lease assume the individual can lift 20 pounds occasionally, 10
> pounds frequently; can stand or walk for – well, there would be no
> limitations on standing or walking or sitting. He could never climb
> ladders, ropes, or scaffolds; occasionally balance. He would need
> to avoid hazards in the workplace, such as unprotected heights,
> dangerous moving machinery, no driving as a work duty. He could
> understand, remember, and carry out simple instructions and
> procedures. He could concentrate long enough to complete simple
> tasks in a timely manner. And he would need a flexible pace.
> With those limitations, could the individual perform the past work?

(AR 54-55). The VE responded that all of Morris's past work would be eliminated by these

limitations, but other jobs would exist, including the jobs of small products assembler, cleaner,

and electronics worker. (AR 55). The VE stated that her testimony was consistent with the

Dictionary of Occupational Titles. (AR 55). She also testified that the typical tolerance for

absences is that a person is unable to maintain competitive employment if he or she is missing

two to three days of work per month, or 12 or more days in a year. (AR 55). Finally, the VE

explained that a worker can be off task for up to 10% of the workday, outside of the regular break

schedule. (AR 55-56).

### D. Summary of the Relevant Medical Evidence

Morris presented to his primary care provider, Dr. Patrick Holly, on March 22, 2012,

complaining of fatigue and lethargy. (AR 306). Morris reported having felt that way for years,

and stated that he did snore and had been told he had apnea. (AR 306). Dr. Holly referred

Morris to Dr. Ammar Ghanem. (AR 307).

Dr. Ghanem saw Morris for a pulmonary new patient consultation on April 17, 2012.

(AR 280). Morris complained of daytime sleepiness and possible sleep apnea. (AR 280). Dr.

Ghanem noted that Morris was an active smoker. (AR 280). Upon examination, Dr. Ghanem found that Morris's Epworth sleepiness score was 16 and his upper airway was severely crowded (AR 281). Dr. Ghanem's impression was that Morris had severe obstructive sleep apnea, which was likely causing his daytime sleepiness as well. (AR 281). Dr. Ghanem directed Morris to undergo a sleep study evaluation, and stated that Morris should not work until after the evaluation given concerns about his safety and the public's safety, with Morris being a bus driver. (AR 281). Dr. Ghanem also recommended that Morris avoid smoking and alcohol, which may worsen sleep apnea, and he encouraged Morris to exercise and lose weight. (AR 281-82).

Morris underwent a home sleep study on April 19, 2012. (AR 287). During the 7.5 hour sleep study recording time, Morris had a total of 138 obstructive hypopneas, 10 obstructive apneas, two central apneas, and one mixed apnea, averaging about 25 per hour. (AR 287). The results showed evidence of severe obstructive sleep apnea, and Dr. Ghanem recommended that Morris be sent for CPAP trial and treatment. (AR 287).

Morris saw Dr. Ghanem for a follow up appointment on May 24, 2012. (AR 297). Dr. Ghanem noted that Morris "ended up on an auto CPAP, but he has struggled using it," as Morris "has difficulty falling asleep on it and waking up very often at night." (AR 297). Morris reported that he had difficulty with fitting the mask and with leaking around the mask, and he believed that his sleep was worse and he was more tired during the daytime. (AR 297). Dr. Ghanem directed Morris to remain off work, and he recommended an in-lab titration study along with a low salt diet and medication for Morris's blood pressure. (AR 298).

Morris next saw Dr. Ghanem on July 26, 2012. (AR 295). Dr. Ghanem wrote that Morris had good oxygen saturation and good sleep consolidation during his titration study. (AR 295). Morris reported that he was having difficulty using his CPAP machine due to hot air going through the mask. (AR 295). Dr. Ghanem noted that Morris was using the CPAP machine for an average of four hours per night. (AR 295). Upon examination, Dr. Ghanem found that Morris's Epworth score had come down to 11, which he found was mainly due to Morris's exercise program and weight loss of 25 pounds. (AR 295). Dr. Ghanem's plan included changing Morris to an auto CPAP with a range between eight to 14. (AR 295). Dr. Ghanem encouraged Morris to continue exercising and losing weight, and he instructed Morris to use a nasal spray to help open up his nose and take some of the pressure away from his mouth. (AR 295).

On August 28, 2012, Morris presented to Dr. Ghanem for a follow up appointment. (AR 293). Dr. Ghanem noted that Morris reported using his CPAP machine more after being switched to an auto CPAP at a rate between eight to 14, although he sometimes would wake up feeling that it was not enough pressure. (AR 293). Morris told Dr. Ghanem that he was still sleepy during the daytime and he had been having chest pain every morning with use of the CPAP. (AR 293). Dr. Ghanem found Morris's Epworth score to be 13 and his upper airway examination to be unchanged, although his nasal exam had improved. (AR 293). Dr. Ghanem planned to increase Morris's range on the CPAP to between nine and 15, and he encouraged Morris to use the CPAP machine all night long every night, as well as during naps. (AR 294). Dr. Ghanem also prescribed Morris with tramadol for his chest pain and started Morris on

Nuvigil with a 150 mg dose for his excessive daytime sleepiness. (AR 294). Dr. Ghanem required Morris to stay off work at least until the next appointment, until Morris could prove compliance with using the CPAP and when his excessive daytime sleepiness improved. (AR 294).

On September 25, 2012, Dr. Ghanem saw Morris for a follow up appointment. (AR 291). Morris reported using his CPAP "more and more," and Dr. Ghanem noted that he was "getting more compliant with it." (AR 291). However, Morris stated that he was "still feeling tired and sleepy during the daytime." (AR 291). Morris reported that the Nuvigil 150 mg caused him to have an upset stomach and had a "variable effect on him as well," so he was not taking it every time. (AR 291). Morris's chest pain was improving. (AR 291). Dr. Ghanem found Morris's Epworth sleepiness score to be an eight and his upper airway examination to be unchanged. (AR 291). Dr. Ghanem recommended that Morris obtain a Multiple Sleep Latency Test ("MSLT") to rule out the possibility of narcolepsy, especially after control of his sleep apnea. (AR 292). Dr. Ghanem permitted Morris to return to work, because he believed it was safe for Morris to drive again as his sleepiness was improving. (AR 292). Dr. Ghanem instructed Morris to continue on Nuvigil. (AR 292).

On October 22, 2012, Morris called Dr. Ghanem's office and reported that he had not been able to maintain his duties at work because his medication was not working, and he wanted to change the medication if possible. (AR 299). Morris stated that he had slept all weekend and "was not able to really wake up." (AR 299). Dr. Ghanem's office called Morris back the next day and left a message instructing him to continue with the same medication until testing was

finished.  (AR 299).

Morris underwent a CPAP titration study on the night of November 11, 2012.  (AR 349).

During the sleep study, Morris achieved all stages of sleep, and he did not snore during the night.

(AR 349).  He did not have any respiratory events.  (AR 349).  He had normal sinus rhythm, and

he did not have to get up during the night to use the restroom.  (AR 349).  Morris had 95.9%

sleep efficiency.  (AR 351).

Morris underwent the MSLT the following morning on November 12, 2012.  (AR 347).

The MSLT consisted of five naps between 7:41 a.m. and 3:56 p.m.  (AR 347).  During the first

nap, Morris entered REM sleep, but when asked about it afterward, Morris stated that he "was

unsure if he dreamt or was just thinking about something," but he "did say he felt like he fell

asleep."  (AR 347).  Between the first and second naps, Morris had a hard time staying awake.

(AR 347).  During the second nap, Morris again entered REM sleep, and he also had a hard time

staying awake between the second and third naps.  (AR 347).  During the third nap, Morris

entered REM sleep, but he "did not appear to have as much trouble staying awake as previous

times between Nap 1 and Nap 2."  (AR 348).  During both the fourth and fifth naps, Morris again

entered REM sleep.  (AR 348).

Morris presented to Dr. Ghanem for a follow up appointment on November 14, 2012, to

review his MSLT results.  (AR 289).  Dr. Ghanem noted that Morris had done well on the

overnight CPAP, but during the MSLT Morris had an average sleep onset of about three minutes

for his daytime naps, and he had five REM onsets of sleep consistent with narcolepsy.  (AR 289).

Dr. Ghanem wrote that Morris reported still feeling tired despite using the Nuvigil.  (AR 289).

Upon examination, Morris's Epworth sleepiness score was 13, and his upper airway exam was unchanged. (AR 289). Because Morris's MSLT results indicated narcolepsy, Dr. Ghanem found Morris to be unsafe to perform his public transportation job. (AR 290). Dr. Ghanem directed Morris not to work until his excessive daytime sleepiness was controlled, and he increased Morris's Nuvigil dosage to 250 mg. (AR 290).

On November 28, 2012, Morris called Dr. Ghanem's office and stated that he was going to do the urine drug screen that day, but he had the flu and the Nuvigil dose was too much, as he had been awake for 48 hours and could not sleep. (AR 299). Morris canceled his appointment for later that day. (AR 299). Dr. Ghanem's office called Morris back later that day and informed him that he could decrease his dosage of Nuvigil back to 150 mg until his next appointment. (AR 299).

On December 12, 2012, Morris presented to Dr. Ghanem for a follow up appointment, and he reported that he had significant alertness for the first two days of his increased Nuvigil dose of 250 mg, but he had difficulty sleeping at night. (AR 333). Morris then "adjust[ed] to it, but he quit using it, and is back to using it again." (AR 333). Dr. Ghanem noted that Morris was "still taking naps sometimes, affecting his ability to sleep at night," and further noted that Morris was not driving, as he had been instructed. (AR 333). Morris informed Dr. Ghanem that he was applying for disability and Social Security. (AR 333). Upon examination, Morris's Epworth score was 10, and Dr. Ghanem found that Morris's chest had good air entry, with no wheezing or crackles. (AR 333). Dr. Ghanem's impression of Morris on this date was that Morris's sleep apnea was controlled by his use of the CPAP, which Morris was compliant with using as

directed; that the MSLT results were consistent with narcolepsy; that Morris was adjusting to his higher dose of Nuvigil slowly, after having had some difficulty with it, but it was "giving him good energy and helping to maintain him awake during the day." (AR 334). Dr. Ghanem also emphasized that Morris's "Epworth score is down to 10." (AR 334). Dr. Ghanem directed Morris not to return to his work in public transportation, an issue they would revisit in two months, and not to drive while sleepy. (AR 334). Dr. Ghanem discussed with Morris the risks and benefits of Nuvigil, but noted that Morris's echocardiogram had shown no major abnormality and that Morris's blood pressure was well maintained. (AR 334).

Morris also underwent a drug test on December 12, 2012, which came back negative for methamphetamines, barbiturates, benzodiazepines, cocaine, methadone, opiates, phencyclidine (PCP) and cannabinoids (THC). (AR 340-41).

On January 16, 2013, Morris presented to Venkata Kancherla, M.D., for an examination at the request of the agency. Morris informed Dr. Kancherla that he was "[s]till feeling tired all the time and [had been] put on medications." (AR 326). Morris told Dr. Kancherla that he was not working and was on medical leave because he has "sleeping problems with tiredness, so it is not safe to drive passengers." (AR 326). Dr. Kancherla listed Morris's medical history as including sleep apnea, narcolepsy, and hypertension, as well as the surgical biopsy of a cyst on his back. (AR 326). Dr. Kancherla discussed Morris's social history, noting that he was single and sometimes had his kids living with him; he smoked half a pack of cigarettes per day; he drank alcohol on the weekends; he denied any illicit or recreational drug use; he had a high school diploma; he drove his car and was able to handle his personal hygiene "okay," but it was

difficult for him to do household chores, which he must do slowly. (AR 326). Dr. Kancherla examined Morris and found him to be "a young, healthy looking, mildly obese male applicant who was alert, awake, and oriented"; who "walked into the examination" "without any assistance or walking devices"; "was able to dress and undress and get on and off the examination table without assistance"; "could recline flat, sit up, and squat"; had blood pressure of 150/100, which "measured in upper extremities"; had a regular heart rate of 68 beats per minute; was 67 inches tall and weighed 225 pounds; had a normal examination of the head, eyes, ears, nose, and throat; had a "short, obese" neck, with "trachea midline," but "no JVD, lymphadenopathy, thyromegaly, or masses"; had a bilaterally symmetrical thorax with no obvious deformities; had regular S1 and S2 upon examination of his heart, with no gallop or murmurs; had lungs that were clear to auscultation, with no rales, rhonchi, or wheezing; had a soft, obese abdomen which caused a "suboptimal examination," but was nontender; had no pitting edema, varicose veins, or ulcerations in his extremities; had no deformity or tenderness over his lumbosacral spine; had a straight leg raise 80 degrees bilaterally; had dorsiflexion of the spine 80 degrees, extension 20 degrees, and lateral rotation 25 degrees; and had "grossly normal" joints. (AR 327). Dr. Kancherla also performed a neurological examination, finding that Morris's speech was normal; he was left-handed; his memory was intact; his cranial nerves II-XII were grossly intact; his biceps and triceps reflexes were normal; his patellar reflexes were 1+ on 0-4 scale bilaterally; his sensory and vibration sensations were normal; he was negative for Babinski's sign; his far vision was 20/25 in the right eye and 20/20 in the left eye, and his near vision was 20/20; his handgrip was 19 kg in his left hand and 21 kg in his right hand; his muscle strength in all four extremities

was 5/5 with normal tone; there was no wasting, atrophy, or fasiculations; there were no involuntary movements; his gait was normal; his station was erect; he was able to walk on his heels and toes and squat; he was able to get up from his chair and take off his socks and shoes while lifting his legs; and he had normal dexterity. (AR 327). Dr. Kancherla's overall impression of Morris was that he had normal gait; a normal physical examination; a history of sleep apnea and narcolepsy, for which he was currently on medication; mild obesity of 225 pounds; and a history of hypertension, with current blood pressure of 150/100, for which he was not on any medication. (AR 327).

On January 29, 2013, J. Sands, M.D., a non-examining state agency physician, reviewed Morris's records and found that Morris did not have any exertional, postural, manipulative, visual, or communicative limitations, but did have environmental limitations in that he should avoid even moderate exposure to hazards such as machinery and heights, due to his narcolepsy. (AR 62-63). Dr. Sands opined that Morris was not disabled. (AR 64).

Morris reported back to Dr. Ghanem on February 12, 2013, and Dr. Ghanem noted that Morris was "overall improved, using Nuvigil as needed, but he uses it most of the time." (AR 331). Dr. Ghanem found Morris's examination to be unchanged from his last visit, but noted that his Epworth score was 11. (AR 331). Dr. Ghanem noted that while Morris was improving, he still felt it was not safe for Morris to go back to public transportation due to his combined narcolepsy and obstructive sleep apnea, given that he had variable symptoms up and down and also had some compliance issues. (AR 332). Dr. Ghanem indicated that he would support Morris in "applying for disability given the chronic nature of his underlying disease and severe

persistent daytime sleepiness" and stated that he would see Morris again in four months unless needed earlier. (AR 332).

On March 15, 2013, a second non-examining state agency physician, B. Whitley, M.D., reviewed Morris's records and agreed with Dr. Sands's opinion that Morris was limited only regarding his exposure to hazards such as machinery and heights, and thus was not disabled. (AR 82).

On June 11, 2013, Morris saw Dr. Ghanem for an appointment, and he reported to Dr. Ghanem that he was still off work and was still in the process of applying for disability. (AR 392). He informed Dr. Ghanem that he would lose his insurance through work and was applying for Medicaid. (AR 392). Morris stated that he could not afford Nuvigil, but was using his CPAP machine most of the time, although he forgets some nights. (AR 392). Morris reported feelings of malaise and fatigue, but had no other physical or mental complaints. (AR 392). Dr. Ghanem examined Morris and found normal results in all areas. (AR 392-93). Dr. Ghanem's assessment of Morris remained the same diagnoses of narcolepsy and obstructive sleep apnea. (AR 393). Dr. Ghanem prescribed Ritalin to Morris instead of the Nuvigil that he had been prescribed previously. (AR 393).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3). The Court's task is limited to determining whether

the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

In determining whether Morris is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required her to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a

16

severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[3] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Id.* at 885-86.

## B. The ALJ's Decision

On February 21, 2014, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 15-25). At step one, the ALJ found that Morris had not engaged in any substantial activity since April 17, 2012, the alleged onset date. (AR 17). At step two, the ALJ found that Morris had the following severe impairments: obstructive sleep apnea, narcolepsy, hypertension, and obesity. (AR 18). At step three, the ALJ found that Morris did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (AR 18-20).

Before proceeding to step four, the ALJ determined that Morris had the following RFC:

The claimant has the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently, stand/walk for approximately 6 hours in an 8-hour day,

---

[3] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 404.945(a)(5), 416.920(e), 416.945(a)(5).

and sit for approximately 6 hours in an 8-hour day, occasionally balance, never climb ladders, ropes, or scaffolds, never be exposed to work place hazards, such as unprotected heights or dangerous moving machinery, and never drive as a job duty. The claimant can understand, remember, and carry out simple instructions and work like procedures, he can concentrate long enough to complete simple tasks in a timely manner, and he can sustain a flexible pace.

(AR 20-21).

At step four, the ALJ considered this RFC and the VE's testimony before finding that the combination of Morris's conditions and the resulting limitations preclude him from performing his past relevant work as a bus driver and production welder. (AR 23-24). The ALJ then concluded at step five that Morris could perform a significant number of unskilled, light work jobs in the economy, including small products assembler, cleaner, and electronics worker. (AR 24-25). Accordingly, the ALJ determined that Morris was not disabled from April 17, 2012, the alleged onset date, through February 21, 2014, the date of the ALJ's decision, and Morris's claims for DIB and SSI were therefore denied. (AR 25).

### C. The ALJ's Step-Three Finding that Morris's Narcolepsy Did Not Meet or Medically Equal Listing 11.03's Criteria is Supported by Substantial Evidence

Morris's first argument is that the ALJ erred by finding that his narcolepsy did not meet or equal the Listing 11.03 criteria. (DE 27 at 8-11). He contends that the ALJ failed to consider, as required, whether the medical findings are at least of equal medical significance to the required criteria. Morris specifically challenges the ALJ's consideration of "the date of the definitive diagnosis" of narcolepsy, because he contends it is undisputed that his symptoms had been previously attributable to narcolepsy in addition to obstructive sleep apnea. (DE 27 at 9). Additionally, Morris contends that the ALJ improperly found that there was no evidence in the

record of narcoleptic attacks or secondary cataplexy, hypnogogic hallucinations, or sleep paralysis, when his MSLT results and clinical notes did document hypnogogic hallucinations consistent with narcolepsy. Morris argues that the ALJ improperly considered "some compliance issues" in deciding that his narcolepsy did not meet the Listing, even though the ALJ was aware that this was due to Morris's inability to afford the medication and side-effects caused by the medication. (DE 27 at 10). Morris states that even when he was compliant with treatment, his narcoleptic symptoms continued. Morris further contends that the ALJ improperly found that his narcolepsy was not sufficiently described by his treatment provider, and he cites to portions of the record which he argues document and describe his narcoleptic episodes. Morris argues that, "[c]ontrary to the ALJ's finding, [his] narcoleptic episodes, with alteration of awareness or significant interference with daytime activity, persisted more than once weekly despite at least three months of prescribed treatment," and therefore Morris contends that he is entitled to remand because he did meet or medically equal Listing 11.03. (DE 27 at 11).

The Commissioner, in its response, contends that the ALJ properly found that Morris did not have an impairment or combination of impairments that met or medically equaled a Listing. The Commissioner explains that the ALJ specifically considered Listing 3.10 regarding sleep-related breathing disorders and Listing 11.03 regarding epilepsy, and considered Listing 11.03 for possible equivalency. The Commissioner cites to the Social Security *Program Operations Manual System* ("POMS") § DI 24580.005 (May 13, 1999), as does the ALJ in her decision, for

its characterization of narcolepsy.[4]  The Commissioner argues that Morris has not shown and

cannot show that his narcolepsy was accompanied by cataplexy, hypnagogic hallucinations, and

sleep paralysis, as the absence of cataplexy is noted twice in the record, and sleep paralysis is not

mentioned in the record at all.  Further, the Commissioner argues that while Morris points to two

pages in the record regarding hypnagogic hallucinations, the comments referenced are

"insufficient to satisfy the requirements of the POMS or the listing."  (DE 33 at 7).  Additionally,

the Commissioner argues that two state agency physicians reviewed the record and determined

that Morris's condition did not meet or equal a Listing, and the ALJ could properly rely upon

their opinions.  Thus, the Commissioner contends that substantial evidence supports the ALJ's

finding that Morris's narcolepsy did not meet or medically equal Listing 11.03 or any other

listing.

In his reply brief, Morris argues that the Commissioner, in its response, improperly

applied the standard for meeting a Listing to its argument regarding whether Morris's

impairments were medically equivalent to a Listing.  (DE 36 at 1-3).  Morris cites to 20 C.F.R. §

404.1526(b) for its explanation of how medical equivalence is determined, and argues that he

does not have to show he meets each element of a Listing in order to show that his impairments

are medically equivalent to a listing.  Morris also argues that the Commissioner provided a new

---

[4]  The POMS are "the Social Security Administration's instructions to employees who make initial disability determinations . . . ."  *Fast v. Barnhart*, 397 F.3d 468, 472 (7th Cir. 2005).  "The POMS manual has no legal force" and is not "controlling," *Parker for Lamon v. Sullivan*, 891 F.2d 185, 190 (7th Cir. 1989), but it is nevertheless an agency source that can be looked to for guidance in Social Security Appeals.  *See, e.g.*, *Gossett v. Colvin*, 527 F. App'x 533, 536 (7th Cir. 2013) (citing to POMS); *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011) (same); *Wyatt v. Barnhart*, 349 F.3d 983, 984 (7th Cir. 2003) (same).  "Although the POMS manual does not impose judicially enforceable duties on an ALJ, it is considered persuasive."  *Thompson v. Astrue*, No. 3:11-CV-472 CAN, 2013 WL 393290, at *4 (N.D. Ind. Jan. 31, 2013) (citations omitted).

rationale not included in the ALJ's decision, specifically that Morris had not shown that he had all three of the "accessory events," "cataplexy, hypnagogic hallucinations, and sleep paralysis." (DE 36 at 3-4). Morris argues that this "should be rejected as *post hoc* rationale," since the ALJ did not provide this rationale in her decision, and further argues that POMS makes it clear that "[n]ot all individuals will have all of the symptoms." (DE 36 at 4). Morris then challenges the Commissioner's arguments regarding the references to hypnagogic hallucinations in the record, because he states that they were "noted explicitly in the objective MSLT results and clinical notes, and were deemed consistent with narcolepsy." (DE 36 at 4 (citing AR 289, 347)). Thus, Morris contends that the ALJ committed error by stating in her decision that there was no description of hypnagogic hallucinations in the record. Additionally, Morris challenges the Commissioner's reliance on the state agency reviewing physicians, as these physicians did not consider Morris's narcolepsy to be a medically determinable impairment and did not address Listing 11.03. (DE 36 at 6-7).

"At the outset, it is critical to note that Listing 11.03 addresses epilepsy, and not narcolepsy." *Mills v. Astrue*, No. 11-CV-01090, 2012 WL 3780304, at *12 (S.D. Tex. Aug. 15, 2012) (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 11.03). The POMS does provide guidance on the "Evaluation of Narcolepsy." *Id.*; *see* POMS § DI 24580.005. This section makes it clear that "[a]lthough narcolepsy and epilepsy are not truly comparable illnesses, when evaluating medical severity, the closest listing to equate narcolepsy with is Listing 11.03, Epilepsy—Minor motor seizures." POMS § DI 24580.005(C).

According to the POMS,

> Narcolepsy is a chronic neurological disorder characterized by recurrent periods of an irresistible urge to sleep accompanied by three accessory events:
>
> 1. Cataplexy—attacks of loss of muscle tone, sometimes with actual collapse, during which the individual always remains conscious.
>
> 2. Hypnagogic hallucinations—hallucinations which occur between sleep and wakening.
>
> 3. Sleep paralysis—a transient sensation of being unable to move while drifting into sleep or upon awakening. In addition, some persons have periods of automatic behavior and most have disturbed nocturnal sleep.

POMS § DI 24580.005(A). The section notes that "[n]ot all individuals will have all of the symptoms," and states that "[t]he severity of narcolepsy should be evaluated after a period of 3 months of prescribed treatment." POMS § DI 24580.005(B)-(C). It further states that "it is important to obtain from an ongoing treatment source a description of the medications used and the response to the medication, as well as an adequate description of the claimant's alleged narcoleptic attacks and any other secondary events such as cataplexy, hypnagogic hallucinations or sleep paralysis." POMS § DI 24580.005(C).

Here, the ALJ included her consideration of Morris's narcolepsy under Listing 11.03 in her written decision. (AR 20). The ALJ wrote:

> The claimant's narcolepsy has been evaluated under Listing 11.03 (Epilepsy), as required by POMS DI 24580.005. In order for narcolepsy to be found equivalent to Listing 11.03, the claimant's treating provider must adequately describe the narcoleptic attacks, along with any secondary cataplexy, hypnagogic hallucinations, and sleep paralysis, and the claimant's narcolepsy must be poorly controlled, despite three months of prescribed treatment, resulting in significant interference with activity during the day.

The claimant's pulmonologist did not formally diagnose the claimant with narcolepsy until November 2012 (Exhibit 7F). At this time, sleep studies showed that the claimant's sleep apnea was in "full control," but that he was still experiencing excessive daytime sleepiness (Exhibit 7F). Narcolepsy was confirmed by MSLT (Exhibits 7F, 10F). The claimant's pulmonologist prescribed Nuvigil and had to increase the dose on at least one occasion (Exhibit 10F). Since this time, this medication has been discontinued and replaced by Ritalin due to cost (Exhibit 14F). After careful review of the records, the undersigned can find no description of narcoleptic attacks or secondary cataplexy, hypnagogic hallucinations, or sleep paralysis. Further, the claimant's doctor has noted "some compliance issues" on more than one occasion, although this appears to be due, at least in part, due to the cost of treatment and the side effects of the medication (Exhibits 7F, 10F, 14F). At this time, however, the claimant's records do not document narcolepsy of sufficient severity to equal Listing 11.03, as the claimant's narcolepsy has not been sufficiently described by his treating provider and there is indication that the claimant has not been entirely compliant with treatment recommendations.

Lastly, the claimant is also obese. He stands 5 feet 8 inches tall and, during the timeframe in question, has weighed between 220 and 250 pounds, resulting in a body mass index of between 33 and 38 (Exhibit 5F, 12F). SSR 02-1p provides that, when obesity is an impairment, adjudicators must consider the effects of obesity when assessing a claim for disability. Obesity in combination with another impairment(s) may increase the severity or functional limitations of the other impairment(s). The undersigned acknowledges that the claimant's obesity contributes to the functional limitations primarily caused by his other severe impairments, but also notes that the claimant has made significant strides in losing weight and improving his health. The claimant's records clearly document some overall improvement during the daytime, as evidenced by a declining Epworth score, and that this is mainly due to the claimant's "weight loss and exercise program" (Exhibit 7F). The claimant's dedication to improving his health is commendable.

Overall, the claimant's impairments, even in combination, do not rise to listing severity.

(AR 20).

Contrary to Morris's arguments, the ALJ did consider whether Morris's narcolepsy was equivalent to Listing 11.03, as she provides the standard "for narcolepsy to be found *equivalent* to Listing 11.03," summarizes the relevant medical evidence, and then concludes that "the claimant's records do not document narcolepsy of sufficient severity to *equal* listing 11.03, as the claimant's narcolepsy has not been sufficiently described by his treating provider and there is indication that the claimant has not been entirely compliant with treatment recommendations." (AR 20 (emphasis added)).

Next, the ALJ's reference to the date that Dr. Ghanem formally diagnosed Morris with narcolepsy was not improper as Morris contends. Both Listing 11.03 and the POMS regarding narcolepsy require that the claimant provide a detailed description from his treatment provider of the symptoms during a period of prescribed treatment lasting at least three months. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 11.03 (stating that epilepsy must be "documented by a detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment"); POMS § DI 24580.005 (stating that "[t]he severity of narcolepsy should be evaluated after a period of 3 months of prescribed treatment"). Thus, the date which Dr. Ghanem diagnosed Morris with narcolepsy is relevant and properly referenced by the ALJ, because that was the point at which Dr. Ghanem began treating Morris for narcolepsy. The ALJ needed to see that Morris had been treated for narcolepsy for at least three months.

While Morris argues that the ALJ improperly considered his "compliance issues" in taking his medication, the ALJ did note that the noncompliance was at least partly "due to the

cost of treatment and the side effects of the medication." (AR 20). The ALJ's discussion of Morris's noncompliance with the treatment prescribed by Dr. Ghanem was proper, because "the Social Security Regulations mandate that, '[u]nder ... 11.03, the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed [ ] treatment." *Mills*, 2012 WL 3780304, at \*13 (alteration in original) (quoting 20 C.F.R. Pt. 404, Subpt. P, App'x 1). Here, Morris did not follow the treatment prescribed by Dr. Ghanem. (AR 291, 331-33, 393). Additionally, at Morris's last documented appointment with Dr. Ghanem, he reported having stopped taking the Nuvigil because he could not afford it; Dr. Ghanem prescribed Ritalin as a lower cost alternative, but there is no medical evidence in the record regarding whether Morris took the Ritalin, how long he took it, or how well it controlled his narcolepsy symptoms. (AR 393). "Because [Morris] did not follow [his] 'prescribed treatment,' it is not appropriate or even possible, to evaluate [his] condition, under Listing 11.03." *Mills*, 2012 WL 3780304, at \*13.

Morris, in his reply brief, characterizes the period from September 2012 to February 2013 as being a period of "treatment compliance for at least three months," and he argues that his narcoleptic symptoms nevertheless continued even when he was compliant with his treatment. (DE 27 at 10). The Court first notes that Morris was not diagnosed with narcolepsy until November 2012, and thus Dr. Ghanem's treatment of Morris for narcolepsy did not begin until then. Nevertheless, Dr. Ghanem's records contradict Morris's contention that he was compliant with treatment for this period, however, beginning with noncompliance in September. Dr. Ghanem first prescribed Nuvigil to Morris at the end of August 2012, at a 150 mg dose. (AR

294).  At his next appointment, at the end of September 2012, Dr. Ghanem noted that Morris was

not taking his Nuvigil every time due to side effects.  (AR 291).  Dr. Ghanem nevertheless

permitted Morris to return to work as a bus driver because his daytime sleepiness was improving,

and he instructed Morris to continue on Nuvigil.  (AR 292).  Dr. Ghanem officially diagnosed

Morris with narcolepsy on November 14, 2012, after reviewing his MSLT results, at which point

he found Morris unsafe to perform his public transportation job and increased Morris's Nuvigil

dose to 250 mg.  (AR 290).  At the end of November 2012, Morris called Dr. Ghanem's office to

report that the 250 mg dose of Nuvigil was too strong, so Dr. Ghanem told him he could go back

down to the 150 mg dose.  (AR 299).  At his next appointment in mid-December 2012, Morris

informed Dr. Ghanem that he had quit using his Nuvigil but was now back to using it again.  (AR

333).  Dr. Ghanem also wrote in his notes for that appointment that the Nuvigil was helping

Morris to stay awake during the day, and his Epworth sleepiness score had decreased.  (AR 334).

Then, at his February 2013 appointment with Dr. Ghanem, Morris reported that he was using his

Nuvigil "most of the time."  (AR 331).  Dr. Ghanem noted that Morris "had some compliance

issues."  (AR 332).  Thus, the period which Morris contends he was compliant with treatment for

at least three months showed repeated non-compliance, as noted by his doctor, and showed

improvement when he was compliant with taking his medication as directed.  The ALJ's

consideration of Morris's compliance issues was therefore proper and relevant to the ALJ's

determination whether Morris's impairment persisted despite following prescribed treatment as

required by the Listing. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 11.00.

　　　Morris also takes issue with the ALJ's finding that "the claimant's narcolepsy has not

been sufficiently described by his treatment provider" as required by the Listing, as he argues that his treatment records do describe his symptoms. (DE 27 at 10-11 (citing AR 20, 280, 294, 299, 347, 349-71)). While portions of the record do mention Morris's self-reported symptoms and complaints, Dr. Ghanem did not provide a description of Morris's narcolepsy and his treatment as outlined in the POMS, which states that it is "important to obtain from an ongoing treatment source a description of the medications used and the response to the medication, as well as an adequate description of the claimant's alleged narcoleptic attacks and any other secondary events such as cataplexy, hypnagogic hallucinations, or sleep paralysis." POMS § DI 24580.005. Dr. Ghanem's appointment notes report that Morris has complained of "excessive daytime sleepiness" and feeling "tired and sleepy during the daytime" (AR 281, 290, 294, 297, 331, 332, 392), but Dr. Ghanem did not describe any "narcoleptic attacks" or the "other secondary events such as cataplexy, hypnagogic hallucinations, or sleep paralysis" detailed in the POMS. POMS § DI 24580.005. The ALJ's finding that Morris's narcolepsy "has not been sufficiently described by his treating provider" (AR 20) is therefore not improper.

In summary, it is the claimant's "burden to present medical findings that match or equal in severity all the criteria specified by a listing." *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) (citing *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006)). Here, Morris has failed to meet this burden, and the "absence of evidence underscores that [Morris's] condition does not meet the severity requirement of Listing 11.03." *Mills*, 2012 WL 3780304, at *13. Thus, the ALJ's finding that Morris's narcolepsy did not meet or medically equal Listing 11.03 is supported by substantial evidence.

*D. The ALJ Properly Rejected Dr. Ghanem's Opinion to the Extent that*
*Dr. Ghanem Opined Morris Was Disabled*

Morris's second argument is that the ALJ erred in rejecting the opinion of Dr. Ghanem

that Morris was disabled. Morris takes issue with the ALJ's decision to discount Dr. Ghanem's

opinion because the ALJ found the opinion to be mostly about Morris's inability to return to his

past work as a bus driver, while Morris contends that Dr. Ghanem's opinion in support of Morris

applying for disability was due to "the chronic nature of his underlying disease and severe

persistent excessive daytime sleepiness," which Morris argues applies to all jobs, not just his past

job as a bus driver. (DE 27 at 11-12 (citing AR 22, 332)). Morris also contends that the ALJ

erred in finding that Dr. Ghanem's opinion "lacks specificity and is too conclusory," as the ALJ

inconsistently also found that Morris's "medical records clearly document obstructive sleep

apnea and narcolepsy." (DE 27 at 12 (citing AR 22, 347)). Morris argues that his MSLT results

should have been considered in conjunction with Dr. Ghanem's opinion, which together showed

his symptom severity was disabling. (DE 27 at 12).

In response, the Commissioner contends that Dr. Ghanem's opinion supporting Morris's

application for disability "lacked specificity and was conclusory," did "not state any tangible

functional limitations," and "merely suggests, indirectly, that the doctor might think Plaintiff was

'disabled.'" (DR 33 at 9). Additionally, the Commissioner argues that the determination of

disability is an issue reserved to the Commissioner. (DE 33 at 9).

In his reply brief, Morris argues that his "critical work-related limitation is falling asleep

unpredictably and chronically, which the Commissioner admits would preclude work if occurring

at the workplace." (DE 36 at 7 (citing DE 33 at 9)). Morris thus concludes that "the ALJ's failure to properly consider evidence from the treating physician indicating that Plaintiff would indeed have episodes of falling asleep in an unpredictable, uncontrollable manner resulted in harmful error." (DE 36 at 7-8 (citing AR 332)). Morris also included an argument in a footnote that, contrary to the Commissioner's position that Dr. Ghanem did not state any tangible functional limitations, "unpredictably falling asleep during the workday is a tangible functional limitation . . . ." (DE 36 at 7 n.5 (citing DE 33 at 9)).

"A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); 20 C.F.R. § 404.1527(d)(2)). "In contrast, a treating physician's administrative opinion—such as the applicant's residual functional capacity (for sedentary work, for example) or whether the applicant is 'disabled'—is not entitled to any particular weight because those determinations are 'reserved to the Commissioner.'" *Collins v. Astrue*, 324 F. App'x 516, 520 (7th Cir. 2009) (quoting 20 C.F.R. § 404.1527(e)); *see also Richison v. Astrue*, 462 F. App'x 622, 625 (7th Cir. 2012) (citations omitted) (finding that a treating physician's opinion that the claimant was disabled was "an ultimate determination reserved to the Commissioner").

Here, the portion of Dr. Ghanem's opinion which Morris contends the ALJ improperly rejected consisted of the following: "I would support the patient applying for disability given the chronic nature of his underlying disease and severe persistent excessive daytime sleepiness."

(AR 332).  Dr. Ghanem did not in fact opine that Morris was disabled or completely unable to work in any setting, but rather merely stated that he would support his application for disability. As the ALJ noted, Dr. Ghanem's appointment notes for the same date also stated that "the patient overall is improving but I still feel it is unsafe for him to go back to public transportation given that combined narcolepsy and obstructive sleep apnea."  (AR 331).

Thus, it would appear that Dr. Ghanem's support for Morris's disability application did relate, in large part, to Dr. Ghanem's belief that Morris's narcolepsy made it unsafe for him to return to his previous work as a bus driver—an opinion with which the ALJ completely agreed and included a prohibition on driving as a job duty in Morris's RFC.  (AR 20-21, 22 ("The undersigned . . . acknowledges that the claimant is no longer able to maintain his CDL license due to his conditions or perform his past work.")).  Thus, the ALJ properly discounted Dr. Ghanem's opinion to the extent that it opined Morris was disabled and entirely unable to work—an issue reserved to the Commissioner—but gave proper weight to the remainder of Dr. Ghanem's opinion regarding Morris's limitations due to his narcolepsy and obstructive sleep apnea, including Dr. Ghanem's main concern that Morris could not safely return to work in public transportation.

As to Morris's arguments in his reply that Dr. Ghanem included a tangible functional limitation that Morris would unpredictably fall asleep during the workday, Morris does not cite to a portion of the record containing this specific limitation, and the Court did not find said limitation during its extensive review and summary of Dr. Ghanem's records.  Dr. Ghanem repeatedly notes that Morris is tired and sleepy during the day and has "excessive daytime

sleepiness" (AR 281, 290, 294, 297, 331, 332, 392), but never states that Morris "unpredictably falls asleep during the day," as Morris alleges in his reply (DE 36 at 7 n.5).

In conclusion, I find that the ALJ properly rejected the portion of Dr. Ghanem's opinion to the extent that it opined on the ultimate issue of Morris's disability, which is an issue reserved to the Commissioner.[5]

---

[5] After the completion of the parties' briefing on this appeal, the Seventh Circuit issued an opinion touching on narcolepsy in *Allensworth v. Colvin*, --- F.3d ---, No. 15-2053, 2016 WL 737786 (7th Cir. Feb. 25, 2016). While this case was not addressed by the parties, the Court nevertheless reviewed and considered *Allensworth* when writing this Opinion. In *Allensworth*, the claimant had a variety of severe physical impairments—including back, leg, and joint pain as well as a herniated disk and arthritis—in addition to hypersomnia, or excessive daytime sleepiness, which was caused by either narcolepsy or, more likely, by severe obstructive sleep apnea. *Id.* at *1. The Seventh Circuit found that the claimant did "not appear to be capable of *any* full-time gainful employment, given his hypersomnia." *Id.* at *4.

*Allensworth*, however, is distinguishable from the facts present here. The claimant in *Allensworth* had severe physical musculoskeletal impairments and pain, as well as medications and side effects from the medications used to treat the pain, *id.* at *1, 3; Morris did not have any similar physical limitations, nor was he taking pain medication or having side effects from pain medication. Additionally, the claimant in *Allensworth* lived with his mother, who did his errands and household chores for him, *id.* at *2-3, while Morris lived with and provided care to his twin sons, and performed the household chores and errands himself (AR 42).

The ALJ in *Allensworth* had discounted the treating physician's opinion based on inconsistencies between the record and the physician's opinion having to do with the claimant's physical impairments and did not address the issue of narcolepsy as a basis for discounting the treating physician's opinion. *Id.* at *2. The ALJ in *Allenworth* also failed "to explain why she gave little weight to [the treating physician's] findings that the plaintiff suffers fatigue and somnolence from his pain medications," which the Seventh Circuit found to be an "especially troubling error." *Id.* at *3. Furthermore, the ALJ in *Allensworth* "also overlooked uncontradicted evidence that the plaintiff has had to stop taking the drug that treated his hypersomnia most effective—Adderall—because of its expense." *Id.*

Here, the ALJ specifically addressed Dr. Ghanem's opinion as it related to Morris's narcolepsy, and the ALJ included limitations relevant to Morris's narcolepsy in the RFC based on Dr. Ghanem's opinion and treatment notes. (AR 20-23). Additionally, the ALJ also specifically considered that Morris's compliance issues were "at least in part, due to the cost of treatment and the side effects of the medication." (AR 20). The ALJ also discussed the fact that Morris had no health insurance and had to use a borrowed CPAP machine and change

*E. The ALJ's RFC Assessment and Hypothetical Posed to the VE Adequately Accounted for Morris's Deficiencies in Concentration, Persistence, and Pace*

Morris argues that the ALJ erred by equating deficiencies in concentration, persistence, and pace to the ability to perform simple work at a flexible pace, specifically by equating Morris's narcolepsy-related concentration impairment to the ability to perform simple work. (DE 27 at 12-13). Morris argues that his deficiencies in persisting in the performance of tasks, especially with his narcolepsy-related fatigue, are different from a difficulty with the complexity of tasks, which is what he contends the ALJ limited in the RFC and in the hypothetical posed to the VE. Morris states that the ALJ did not ask the VE if an employee could sleep on the job in the jobs the VE provided in response to the hypothetical. Because the VE testified that an individual must be on task for at least 90% of the workday, Morris contends that his narcolepsy sleepiness and naps would interfere with this ability to stay on task 90% of the day.

In response, the Commissioner argues that Morris has not pointed to any evidence in the record that his limitations regarding concentration, persistence, and pace were greater than those found by the ALJ. (DE 33 at 9). In Morris's reply brief, he reiterates the arguments made in his opening brief and contends that the Commissioner failed to address in its response "the ALJ's

---

medications due to cost. (AR 23). Thus, the ALJ here did not make the same errors that were pivotal to the Seventh Circuit's decision in *Allensworth*.

Additionally, in *Allensworth*, there was evidence in the record of the claimant falling asleep during tasks, and the VE specifically testified that the claimant would be unemployable if he fell asleep during the workday. *Allensworth*, 2016 WL 737786, at *1, 4. Here, the VE was not asked by Morris's counsel to opine as to whether jobs would exist if a person "falls asleep during the workday," and thus there is no evidence in the record on this matter before the Court, nor was there evidence in the record before the ALJ on this matter. (AR 54-56). Finally, the Court reiterates that there is nothing in Dr. Ghanem's records stating that Morris unpredictably falls asleep during the day.

error in equating narcolepsy-related somnolence with the ability to perform simple work at a flexible pace." (DE 36 at 8).

The United States Court of Appeals for the Seventh Circuit ("the Seventh Circuit") has made clear that, "[a]s a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014) (citations omitted). "This includes any deficiencies the claimant may have in concentration, persistence, or pace." *Id.* (citations omitted). The Seventh Circuit explained that "[a]lthough it is not necessary that the ALJ use the precise terminology of 'concentration,' 'persistence,' or 'pace,' we will not assume that a VE is apprised of such limitations unless he or she has independently reviewed the medical record." *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015) (quoting *Yurt*, 758 F.3d at 857). However, the Seventh Circuit "also ha[s] let stand an ALJ's hypothetical omitting the terms 'concentration, persistence and pace' when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) (collecting cases); *see also Capman v. Colvin*, 617 F. App'x 575, 578-79 (7th Cir. 2015) (finding that the limitations included by the ALJ in the RFC and the hypothetical question posed to the VE adequately addressed the claimant's deficiencies in concentration, persistence, and pace stemming from his anxiety attacks that occurred around other people by limiting the claimant "to simple, routine tasks that did not require working with the public or in close proximity or cooperation with others"); *Simila v. Astrue*, 573 F.3d 503, 520-21 (7th Cir. 2009) (finding that the ALJ adequately

accounted for the claimant's impairments in concentration, persistence, and pace caused by chronic pain syndrome and somatoform disorder by limiting the claimant to "light, unskilled work that did not involve hazardous machinery or heights").

Here, while Morris is correct that the ALJ did not specifically include the phrase "moderate limitations in concentration, persistence, and pace" in the RFC or the hypothetical question posed to the VE, the ALJ nevertheless adequately addressed Morris's limitations in these areas in the RFC and hypothetical posed to the VE. Specifically, the ALJ included the following relevant provisions: "never climb[ing] ladders, ropes, or scaffolds"; "never be[ing] exposed to work place hazards, such as unprotected heights or dangerous moving machinery"; "never driv[ing] as a job duty"; but "can understand, remember, and carry out simple instructions and work like procedures"; "can concentrate long enough to complete simple tasks in a timely manner"; and "can sustain a flexible pace." (AR 20-21).

These restrictions adequately account for Morris's limitations caused by his narcolepsy, as Morris would be restricted from situations such as heights he could fall from or machinery he could be injured by, and he is totally prohibited from driving for work, all of which are limitations which would protect him and others from being harmed if he were to fall asleep. The driving prohibition mirrors Dr. Ghanem's opinion that Morris should not drive for work due to safety reasons. The ALJ's RFC and hypothetical to the VE also specifically take into account Morris's limitations in concentration, persistence, and pace, as the ALJ makes it clear that Morris "can *concentrate long enough* to complete simple tasks in a *timely* manner"; and "can *sustain* a flexible *pace*." (AR 20-21 (emphasis added)). Thus, the ALJ included specific limitations which

34

adequately address Morris's deficiencies in concentration, persistence, and pace, as well as the other limitations resulting from his narcolepsy.

Additionally, the Commissioner is correct that Morris has not directed the Court to any evidence in the record that would support finding limitations in concentration, persistence, and pace greater than those found by the ALJ. Thus, Morris has failed to meet his burden here. *See Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); *Schneck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." (citing 20 C.F.R. § 404.1512(c); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987))).

It is therefore "manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with [Morris's] limitations would be unable to perform," *see O'Connor-Spinner*, 627 F.3d at 619, and the Court finds the ALJ did not err regarding Morris's deficiencies in concentration, persistence, and pace.

### F. The ALJ's Credibility Determination Is Supported by Substantial Evidence and Will Not Be Disturbed

Morris's final argument is that the ALJ erred in discounting Morris's credibility as to the severity of his symptom testimony. Morris claims that the ALJ erred by fully crediting his narcolepsy diagnosis while also failing to credit Morris's inability to stay awake, which Morris contends would be a relevant consideration in any job, not just driving a bus. (DE 27 at 14). Morris argues that the ALJ's credibility finding and corresponding determination that his drowsiness would affect only his past relevant work fails to build a bridge from the evidence to

the ALJ's conclusion.  Additionally, Morris argues that the ALJ attempted to "play doctor" by finding Morris's treatment recommendations to be minimal, as they included only medications and the use of a CPAP machine, particularly as Morris contends the ALJ did not explain what treatment would be more than minimal or what type of treatment the ALJ thought Morris should have received.  (DE 27 at 15).  Morris also argues that the ALJ did not properly explain her consideration of his activities of daily living in discounting his testimony, which he recounts in his brief.  (DE 27 at 15-17).  Morris contends that the ALJ erred by failing to consider how the limitations Morris described in his testimony at the hearing would prevent him from performing work on a regular and continuing basis.  (DE 27 at 17).  Morris also takes issue with the ALJ's finding that he "does currently nap excessively throughout the day as an alternative measure to control his symptoms," which the ALJ found was "at least in part due to circumstance and convenience, as the claimant is able to leave his home, such as to attend appointments such as his hearing, without significant interference."  (DE 27 at 17 (quoting AR 23)).  Morris argues that he stays home because of his need to nap; that he does not nap because he is at home.  Morris also argues that the ALJ improperly discounted his testimony because he had been able to remain awake for his appointments, including his appointment with the consultative examiner, Dr. Kancherla, and his doctors had not witnessed a narcoleptic episode; Morris argues that the MSLT results show that he had difficulty staying awake, as he napped during the study.  Morris's last argument regarding credibility is that the ALJ improperly stated that Morris had "not described any significant worsening" of his condition since he had lost his insurance, despite being unable to take medication or fix his CPAP machine.  (DE 27 at 19 (citing AR 23)).  Morris argues that

he did complain to Dr. Ghanem of malaise and fatigue at his last appointment in June 2013, and he explained at the hearing that the new medication, Ritalin, was not working.

The Commissioner, in response, argues that the ALJ properly considered her own observations of Morris, as observations are an important consideration for a credibility determination. (DE 33 at 10). The Commissioner contends that the ALJ properly considered that Morris's daily activities were inconsistent with allegations of debilitating sleepiness. (AR 33 at 10). Finally, the Commissioner also argues that Morris's belief that the ALJ concluded his narcolepsy would affect only his past relevant work, not any other jobs, is entirely incorrect, as the ALJ did not reach any such conclusion. The Commissioner states that the ALJ found, to the contrary, that a person with Morris's light work limitation would not be able to perform any of Morris's past work because both of Morris's previous jobs, as a bus driver and production welder, required a medium level of exertion. (DE 33 at 10-11). While the Commissioner agrees that the ALJ's inclusion of the prohibition on Morris driving for work in his RFC would also preclude him from working as a bus driver, the Commissioner argues that the ALJ did not find that his narcolepsy would only limit his ability to perform past work. (DE 33 at 11).

In Morris's reply, he reiterates the arguments he made in his opening brief, again contending that the ALJ's credibility determination was unsupported by substantial evidence and that the ALJ erred by failing to explain how Morris's narcolepsy precluded his past work but not other jobs. (DE 36 at 8-9).

An ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th

Cir. 2000). If an ALJ's determination is grounded in the record and she articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), her determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "*serious errors* in reasoning rather than merely the demeanor of the witness . . . .").

In the ALJ's decision, she provided the following lengthy discussion as to the credibility of Morris's symptom testimony:

> After careful consideration of the evidence, the undersigned finds the claimant mostly credible. The undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's conclusion that these symptoms cause him to be entirely unable to work is not consistent with his testimony regarding what he can do. However, the undersigned does find that the claimant's impairments would cause him significant work limitations as described in the above residual functional capacity.
>
> The claimant's severe impairments do significantly impact his ability to perform some types of work. The undersigned does not contest the validity of claimant's diagnoses - as his medical records clearly document obstructive sleep apnea and narcolepsy - his most limiting conditions - and acknowledges that the claimant is no longer able to maintain his CDL license due to his conditions or perform his past work.
>
> The claimant's ongoing complaints of daytime sleepiness and fatigue are well-documented (Exhibits 7F, 8F, 10F, 12F). He has sought treatment from specialists and undergone a considerable amount of testing, all of which confirms his conditions (Exhibits 6F, 12F, 16F). However, at these visits, his doctors never mention witnessing a narcoleptic episode. The claimant may certainly feel extraordinarily sleepy and fatigued, but there is no evidence

suggesting that he has trouble staying awake for his appointments.

The State Agency's internal medicine examiner, Vekata Kancherla, M.D., made similar observations (Exhibit 9F). He described the claimant as a ["]young, healthy looking, mildly obese male applicant who was alert, awake, and oriented" (Exhibit 9F). The claimant's speech was "normal" and his memory was "intact" (Exhibit 9F). Dr. Kancherla did not observe any symptoms of sleep apnea and narcolepsy that would interfere with his being able to complete simple tasks.

However, the claimant's pulmonologist, Dr. Ghanem, has noted that he supports the claimant application for disability "given the chronic nature of his underlying disease and severe, persistent excessive daytime sleepiness" (Exhibit 10F). This opinion seems to be mostly about the claimant's ability to perform his past work as a bus driver. Considered as a general statement, it lacks specificity and is too conclusory to be given much weight.

The State Agency concluded that the claimant's impairments would limit him from working jobs which required even moderate exposure to hazards (Exhibit 1A, 2A, 5A, 6A). Great weight is given to the State Agency's opinions, which considers both the objective medical findings in the records and the claimant's allegations. The undersigned has considered the credibility of the claimant's allegations, including his argument that he cannot sustain attention for a full 8-hour workday, and has concluded that this argument is simply not persuasive.

Factors relevant to assessing the credibility of the claimant's allegations include: his daily activities; the location, duration, frequency, and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; any measures used to relieve the pain or other symptoms; and other factors concerning the functional limitations and restrictions due to pain or other symptoms (see 20 CFR 404.1529 and 416.929). In this case, the above factors are not indicative of ongoing disability. These factors do all support the existence of severe impairments and some resulting limits, but the records as a whole fall[] short of establishing disabling limitations.

The claimant's descriptions of his daily activities do not support his claim for disability. The claimant described few limitations in his daily activities; the claimant cooks, cleans, drives, and otherwise manages to function on a day-to-day basis.

Similarly, although the claimant has described feeling sleepy and groggy nearly all the time, the intensity of these symptoms was not consistent with his presentation at hearing. The claimant was able to stay alert and answer questions without any apparent difficulty for the nearly hour long hearing.

Overall, the claimant's treatment and medication recommendations are minimal, including medications and the use of a CPAP machine. The undersigned acknowledges that the claimant currently has no health insurance or resources with which to maintain his condition and has considered the claimant's use of a borrowed CPAP machine (since his is broken), as well as the claimant's change in medications due to cost. However, even under these less than ideal conditions, the claimant has not described any significant worsening. The undersigned does not doubt that the claimant does currently nap excessively throughout the day as an alternative measure to help control his symptoms. However, it appears that these naps are at least in part due to circumstance and convenience, as the claimant is able to leave his home, such as to attend appointments such as this hearing, without significant interference.

The claimant has a strong work history, and the undersigned fully believes that if the claimant could continue his bus-driving career, he would. However, the records reflect that the claimant was prohibited from working mostly due to safety concerns (Exhibits 5F, 7F, 10F, 12F, 14F, 15F). When the claimant was released back to work after several months off, he did attempt to go back and was able to work for several weeks before his doctor took him off work again. These facts suggest that the claimant is motivated to work and that he is able to work despite his ongoing sleepiness. This does not mean that the claimant's conditions do not cause him limitations - because they certainly do. The claimant certainly must avoid hazards and driving, as well as avoid jobs requiring performance of complex tasks. However, as is explained below, this reduced residual functional capacity does not prohibit all work activity.

(AR 22-23).

This thoughtful credibility determination by the ALJ seems to give great credit to Morris, credit which the Court agrees that he deserves. He does have a solid work history as a bus driver,

40

and he only stopped working as a bus driver when his narcolepsy diagnosis made it unsafe for him to continue transporting the public. The ALJ found Morris to be "mostly credible" (AR 22), and thus she did not reject all or even most of his symptom testimony. She believed that Morris's narcolepsy and obstructive sleep apnea do cause limitations in the work that he can perform, and assigned him an RFC that included limitations prohibiting him from being exposed to hazards or driving as a job duty. (AR 20-21). The ALJ did not agree with Morris's "conclusion that these symptoms cause him to be entirely unable to work" and she therefore discounted his credibility and provided a lengthy explanation as to why she did so.

As previously stated above, the ALJ is in the best position to evaluate the credibility of a claimant's testimony during the hearing, and thus the ALJ's credibility determination is accorded special deference by the Court. *Powers*, 207 F.3d at 435. Here, the ALJ's credibility analysis is based on a variety of facts and observations, including the medical evidence, Morris's activities of daily living, Morris's minimal treatment, and the ALJ's observations of Morris during the hearing, all of which did not support the severity of his complaints. *See id.* at 435-36 (upholding an ALJ's reduced credibility determination as being supported by substantial evidence where it was based on these same factors). While Morris attempts to nit-pick the ALJ's credibility determination by taking small sections of the ALJ's written analysis out of context, on the whole, the ALJ's credibility determination shows that she considered all of the materials in the record, as well as Morris's testimony and her observations of Morris at the hearing. She provided a well-reasoned and well-supported explanation as to why she was discounting his testimony that he was entirely unable to work due to his narcolepsy symptoms. Thus, the ALJ's credibility

determination is supported by substantial evidence in the record and will not be disturbed.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The

Clerk is directed to enter a judgment in favor of the Commissioner and against Morris.

SO ORDERED.

Entered this 31st day of March 2016.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge